# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Fernando Montoya,

Case No. 25-cv-00015 (JRT/ECW)

Petitioner,

v.

**REPORT AND RECOMMENDATION**

B. Eischen,

Respondent.

This matter is before the undersigned United States Magistrate Judge on Petitioner Fernando Montoya's ("Petitioner" or "Montoya") Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241. (Dkt. 1.) This case has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

Montoya has asked the Court to consider his petition in two parts: first, that the Court determine when Montoya should have begun earning First Step Act time credits ("FTCs"), and, second, following that decision, that the Court give the parties an opportunity to brief whether any remaining FTCs may be applied to shorten the duration of Montoya's term of supervised release. (Dkt. 35.) Respondent does not object to this procedure, and the Court agreed to proceed as Montoya suggests. (Dkt. 36.) The Court now determines that Montoya has received all FTCs to which he is entitled.

## I.    BACKGROUND

On August 17, 2018, Montoya was arrested for Unlawful Possession of a Controlled Substance by a drug enforcement team in the state of Illinois. (Dkt. 14 ¶ 4.)

He was detained in state custody following his arrest.  (*Id.*; Dkt. 1 at 9.)[1]  On January 1, 2019, Montoya was indicted in federal court for Conspiracy to Distribute Heroin and Possess with Intent to Distribute Heroin.  (*Id.* ¶ 6 (citing *United States v. Montoya*, No. 19-CR-20001-001 (W.D. Tenn.)).)  On March 6, 2019, Montoya was sentenced to a ten-year term of imprisonment in his state court case.  (*Id.* ¶ 5.)

On May 15, 2019, Montoya was taken into secondary custody by the U.S. Marshals Service pursuant to a Writ of Habeas Corpus Ad Prosequendum.  (*Id.* ¶ 7.)  On September 11, 2019, the state court ordered that Montoya's state sentence should run concurrent with his pending federal sentence, and ordered that Montoya be allowed to serve his concurrent sentences in federal custody.  (*Id.* ¶ 5; Dkt. 1-2 at 2.)  This order was signed by the state court judge and initialed by the Illinois Bureau County State's Attorney,[2] Geno J. Caffarini, and Montoya's counsel at the time, Douglas B. Olivero. (Dkts. 27-2, 27-4.)  Olivero stated in an affidavit:

> I remember discussing with the Bureau County State's Attorney making Montoya's state sentence concurrent with his federal sentence, and also allowing Montoya to serve his Illinois sentence in federal custody. The Bureau County State's Attorney agreed with both of these items, and that's why he initialed the order providing that the state sentence is concurrent with the federal sentence, and also that Montoya be allowed to serve his time in federal custody.

(Dkt. 27-2 ¶ 10.)

---

[1]   Unless stated otherwise, references to page numbers in this Report and Recommendation are to the CM/ECF pagination.

[2]   The Illinois Bureau County State's Attorney is the chief law enforcement officer for Bureau County.  (*See* Dkt. 27 at 49).  Caffarini was appointed to the position in 2015 and won elections to retain the position in 2016 and 2020.  (Dkt. 27-3 at 1.)

On December 6, 2019, Montoya was sentenced to a 120-month term of imprisonment in his federal case. (Dkt. 14 ¶ 8.) The sentencing court ordered that Montoya's federal sentence be served concurrently with his state sentence, and that the sentence "be served in federal custody at the Federal Bureau of Prisons." (*Id.* ¶ 8; Dkt. 14-5 at 2.) After sentencing, the U.S. Marshals "attempted to transfer Montoya to the BOP to serve his federal sentence." (Dkt. 14 ¶ 9.) However, the BOP determined that Montoya was still in the primary custody of the State of Illinois, and Montoya remained in state facilities. (*Id.*)

On September 11, 2020, Montoya filed a grievance with the Illinois Department of Corrections. (Dkt. 1-2 at 6.) Montoya asserted that he should be in federal, rather than state custody, and requested that his file be reviewed in order to determine what would need to happen for the state of Illinois to release him to federal custody. (*Id.* at 7.) Montoya stated that one of the reasons that he wanted to be in federal custody was to be able to participate in First Step Act ("FSA") programing. (*Id.* at 6.) The counselor who responded to Montoya's grievance determined that it was outside the jurisdiction of the facility and directed Montoya to send his grievance to an Administrative Review Board. (*Id.* at 6.) Montoya did so in a letter dated November 10, 2020. (Dkt. 1-2 at 8.) In response, the state informed Montoya that this was a "BOP problem." (Dkt. 1 at 10.)

During his incarceration in state prison, Montoya worked several jobs. (Dkt. 1 at 9.) Specifically, Montoya worked as an orderly at the Statesville, Illinois facility from December 7, 2019 to January 17, 2021. (*Id.*) At the Robinson, Illinois facility, Montoya worked as a kitchen employee from January 18, 2021 to September 1, 2022. (*Id.*)

During this time, Montoya also earned certificates in custodial maintenance and culinary arts.  (*Id.*)

On September 1, 2022, Montoya completed his state sentence.  (Dkt. 13 ¶ 18.)  He was temporarily housed as a holdover inmate at FTC Oklahoma City and later at FCI Victorville.  (*Id.*)  Respondent asserts that Montoya "was not assigned a work detail" during this time.  (*Id.*)  However, Montoya asserts that he worked as an orderly while at the Oklahoma City facility.  (Dkt. 1 at 9.)

On January 17, 2023, Montoya arrived at his first "designated institution, the satellite camp at USP Atwater."  (Dkt. 13 ¶ 5.)  From January 17, 2023 to August 13, 2023, Montoya earned 10 days of FTCs for every 30 days of programing.  (*Id.* ¶ 20).  Montoya then began earning 15 days of FTCs for every 30 days of programming due to a decrease in his PATTERN score.[3]  (*Id.*)  On March 26, 2024, Montoya was "taken out of FTC earning status" while he was in transit from USP Atwater to FPC Duluth.  (*Id.* ¶ 19.)  Montoya returned to earning status on May 12, 2024.  (*Id.*)

On January 3, 2025, the Clerk's Office received Montoya's Petition for Writ of Habeas Corpus.  (*See* Dkt. 1; Dkt. 1-4.)  The Court appointed counsel to represent Montoya, and briefing was completed on April 14, 2025.  (Dkts. 16, 27.)

Montoya was released to a Residential Reentry Center on August 26, 2025.  (Dkt. 34 ¶ 5.)  The BOP calculated that, as of October 27, 2025, Montoya had earned 365 days

---

[3]     The Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN") is part of the Risk and Needs Assessment System that Congress required the Attorney General to develop in the First Step Act.  (Dkt. 13-4 at 2; *see also* 18 U.S.C. § 3632 (a).)

of FTCs towards an early release and 85 days of FTCs towards a pre-release RRC or home confinement placement.  (*Id.* ¶ 4.)

## II.    LEGAL STANDARD

"Congress enacted the [FSA] in 2018 to reduce the federal prison population while also creating mechanisms for maintaining public safety by reducing recidivism risk." *Malave v. United States*, No. 24-CV-2404 (SRN/DLM), 2024 WL 4989428, at *2 (D. Minn. Nov. 8, 2024) (citing Cong. Rsch. Serv., The First Step Act of 2018: An Overview 1 (2019), https://perma.cc/9JDZ-H6JH), *R. & R. adopted*, 2024 WL 4987309 (D. Minn. Dec. 5, 2024).  Under the FSA, the BOP provides inmates opportunities to participate in evidence-based recidivism reduction programs ("EBRRPs") and productive activities ("PAs"), which, upon completion, "provide incentives and rewards for prisoners." *Wilson v. Rardin*, No. 23-CV-1653 (PAM/ECW), 2024 WL 2222488, at *5 (D. Minn. Apr. 15, 2024) (citation modified), *R. & R. adopted*, 2024 WL 2220748 (D. Minn. May 15, 2024).  One such incentive is that a prisoner who completes EBRRPs or PAs earns time credits, which "are 'applied toward time in pre-release custody or supervised release.'" *Malave*, 2024 WL 4989428, at *2 (citing 18 U.S.C. §§ 3632(d)(4)(c), 3624(g)).  These time credits are the FTCs sought by Montoya in his Petition.

### A.    Statutory Provisions

The FSA required the Attorney General, in consultation with an Independent Review Committee, to develop a risk and needs assessment system ("the System").  18 U.S.C. § 3632(a).  This System shall be used to, among other things, "determine the type and amount of evidence-based recidivism reduction programming that is appropriate for

each prisoner and assign each prisoner to such programming accordingly." 18 U.S.C.

§ 3632(a)(3). Further,

> The System shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including—
>
> (1) programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and
>
> (2) information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

18 U.S.C. § 3632(b). Under the FSA, the term "evidence-based recidivism reduction

program" is defined as a group or individual activity that:

> (A) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism;
>
> (B) is designed to help prisoners succeed in their communities upon release from prison; and
>
> (C) may include--
>   (i) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;
>   (ii) family relationship building, structured parent-child interaction, and parenting skills;
>   (iii) classes on morals or ethics;
>   (iv) academic classes;
>   (v) cognitive behavioral treatment;
>   (vi) mentoring;
>   (vii) substance abuse treatment;
>   (viii) vocational training;
>   (ix) faith-based classes or services;
>   (x) civic engagement and reintegrative community services;
>   (xi) a prison job, including through a prison work program;
>   (xii) victim impact classes or other restorative justice programs; and
>   (xiii) trauma counseling and trauma-informed support programs.

6

18 U.S.C. § 3635(3).  The term "productive activity" is defined as "either a group or individual activity that is designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating."  18 U.S.C. § 3635(5).

Eligible prisoners[4] who successfully complete evidence-based recidivism reduction programming or productive activities, "**shall** earn time credits as follows:"

>    (i)      A prisoner shall earn 10 days of time credits for every 30 days of **successful participation in evidence-based recidivism reduction programming or productive activities**.
>
>    (ii)     A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of **successful participation in evidence-based recidivism reduction programming or productive activities.**

18 U.S.C. §§ 3632(d)(4)(A) (emphases added).

However,

>    A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed--
>
>    (i)      prior to the date of enactment of this subchapter; or
>
>    (ii)     **during official detention prior to the date that the prisoner's sentence commences under section 3585(a)**.

18 U.S.C. § 3632(d)(4)(B) (emphasis added).

---

[4]      Under 18 U.S.C. §§ 3632(d)(4)(D), prisoners who are serving convictions for certain crimes are ineligible to receive time credits.

Under 18 U.S.C. § 3585(a), "[a] sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." Further, "[t]he Director of the Bureau of Prisons **shall** provide all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, throughout their entire term of incarceration." 18 U.S.C. § 3621(h)(6)(emphasis added).

**B.     BOP Regulations**

In addition to these statutory provisions, the BOP has promulgated additional regulations governing FTCs under the FSA. Under these regulations, "[a]n eligible inmate begins earning [FTCs] after the inmate's term of imprisonment commences (**the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served**)." 28 C.F.R. § 523.42(a) (emphasis added). Further, "[a]n eligible inmate, as defined in this subpart, may earn [FTCs] if he or she is successfully participating in EBRR programs or PAs **that the Bureau has recommended based on the inmate's individualized risk and needs assessment** on or after January 15, 2020." 28 C.F.R. § 523.42(b)(3) (emphasis added). BOP regulations define "successful participation" to require "a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs **that the Bureau has recommended based on the inmate's individualized risk and needs assessment**, and

8

has complied with the requirements of each particular EBRR Program or PA."  24 C.F.R. § 523.41(c)(2) (emphasis added).

BOP regulations also provide that "Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of [FTC] eligibility."  24 C.F.R. § 523.41(c)(3).  However, in the event of a prisoner's "[t]emporary transfer to the custody of another Federal or non–Federal government agency (e.g., on state or Federal writ, transfer to state custody for service of sentence, etc.)," the inmate "will generally not be considered to be 'successfully participating' in EBRR Programs or PAs."  24 C.F.R. § 523.41(c)(4)(iii).

## C.      The Administrative Procedure Act and *Loper Bright*

The Administrative Procedure Act ("APA") sets forth the process by which agencies like the BOP promulgate regulations.  *See* 5 U.S.C. § 551 et seq.  The APA also provides that:  "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  The reviewing court shall:

> hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity; [or]
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

9

5 U.S.C. § 706(2)(A)-(C).

In *Loper Bright v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court established a framework for Courts to review agencies' interpretation of statutes pursuant to the APA.  Under this framework: "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."   603 U.S. at 371.  In doing so, courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous."  *Id.* at 413.  However, an agency's interpretation of a statute "may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'"  *Id.* at 402 (alteration in original) (quoting *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 98 n.8 (1983)).

### III.   ANALYSIS

In his Petition, Montoya argues that he should have began earning FTCs immediately after his federal sentencing on December 6, 2019, and as a result, Montoya was denied credits for 1,137 days of imprisonment.  (Dkt. 1 at 10-11.)  Respondent, on the other hand, maintains that the BOP correctly calculated Montoya's FTCs.  (Dkt. 12 at 1.)  The parties' dispute three aspects of the FTC calculation: (1) when Montoya's sentence commenced, rendering him eligible to begin earning FTCs; (2) whether Montoya successfully participated in EBRRPs or PAs prior to his arrival at USP Atwater; and (3) whether Montoya should have earned FTCs during the time he spent in transfer between facilities.  Each issue is discussed in turn.

10

**A.    When Montoya Became Eligible to Earn FTCs**

Under the FSA, prisoners are not eligible to earn FTCs prior to the date that the prisoner's "sentence commences," which is defined as "the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served."  18 U.S.C. §§ 3632(d)(4)(B)(ii), 3585(a).  Montoya argues that under this provision, he was eligible to begin earning FTCs when he was taken into custody following his sentencing on December 6, 2019.  (Dkt. 27 at 1.)  Respondent, however, argues that Montoya was not eligible to earn FTCs until he arrived at USP Atwater on January 17, 2023.  (Dkt. 12 at 21.)  Respondent relies on a BOP regulation that prisoners begin earning FTCs "after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served)."  28 C.F.R. § 523.42(a).

Montoya challenges the validity of this regulation, arguing that it "contravenes Congress's intent" and conflicts with the statutory definition of when a sentence commences.  (Dkt. 27 at 6-7 (citing 18 U.S.C. § 3585(a) ("the date the defendant is received in custody **awaiting transportation to**, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." (emphasis added))).)  Respondent counters that 28 C.F.R. § 523.42(a) does not conflict with the FSA because, while 18 U.S.C. § 3632(d)(4)(B)(ii) states that prisoners *cannot* earn time credits *prior* to the commencement of the prisoner's sentence pursuant to 18 U.S.C. § 3585(a), it does not *require* that they become eligible to earn FTCS

11

immediately upon that date.  (Dkt. 12 at 20-21.)  Montoya responds that other provisions of the FSA do create that requirement.  (*See* Dkt. 27 at 3.)  In particular, the FSA states that:

> The Director of the Bureau of Prisons **shall** provide all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, **throughout their entire term of incarceration**.

18 U.S.C. § 3621(h)(6) (emphases added).

While the Eighth Circuit has not yet ruled on this issue, courts in this District and other jurisdictions have concluded that 28 C.F.R. § 523.42(a) is invalid because it conflicts with the language of Section 3585(a) defining when a term of imprisonment begins.  *E.g.*, *Harper v. FCI Waseca*, No. 23-CV-2502 (JRT/TNL), 2024 WL 3164981 at *4 (D. Minn. May 28, 2024) (concluding that 28 C.F.R. § 523.42(a) is not an appropriate interpretation of the FSA because "Section 3585(a) clearly indicates that a sentence commences when a defendant is received in custody awaiting transportation to an official detention facility.") (citation modified), *R. & R. adopted sub nom.,* 2024 WL 3163730 (D. Minn. June 25, 2024); R. & R. at 5, *Smith v. Bureau of Prisons*, No. 24-cv-4268 (D. Minn. Apr. 14, 2025) (Dkt. No. 9) ("The BOP's final rule defining the commencement of an inmate's term of imprisonment as 'the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served' patently conflicts with the FSA's explicit, unambiguous incorporation of 18 U.S.C. § 3585(a) which provides that '[a] sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to

commence service of sentence at, the official detention facility at which the sentence is to be served.'  18 U.S.C. § 3585(a).  These two definitions cannot be reconciled."); *Modeste v. Birkholz*, 809 F. Supp. 3d 891, 900 (D. Alaska 2025) ("By redefining when a prisoner's sentence 'commences' in a way that further restricts when an otherwise eligible prisoner may begin to earn FSA time credits, § 523.42(a) creates an 'additional exclusion to general eligibility not found in the FSA's unambiguous eligibility provisions.'") (quoting *Pelullo v. FCC Coleman-Low*, Case No. 5:23-cv-189-WFJ-PRL, 2024 WL 3771691, at *4 (M.D. Fla. Aug. 13, 2024));  *Heath v. Knight*, No. 22-7270 (RMB), 2024 WL 5198863, at *5 (D. N.J. Dec. 23, 2024) ("Under BOP's interpretation in 28 C.F.R. § 523.42(a), a prisoner may begin earning FSA time credits on the date the prisoner arrives at the designated BOP facility where he will serve his sentence.  This conflicts with the plain meaning of the statute.  Here, the difference between when Petitioner was received in BOP custody and awaiting transportation and when he arrived at the designated BOP facility to serve his sentence was seven months.  Because the regulation does not allow a prisoner to earn FSA time credit for the time spent 'awaiting transportation' during those seven months, the Court finds the regulation contravenes the plain language of the FSA and is therefore invalid."); *Huihui v. Derr*, No. CV 22-00541 JAO-RT, 2023 WL 4086073, at *5 (D. Haw. June 20, 2023) ("Congress has directly spoken to the precise question of *when* a prisoner is ineligible for FSA ETCs in 18 U.S.C. § 3632(d)(4)(B), which explicitly bars a prisoner from earning credits (1) before the statute was enacted, and (2) during official detention before the prisoner's sentence commences under § 3585(a).  Section 3585(a) unambiguously provides that "[a] term of

imprisonment commences" when a prisoner is received in custody awaiting transportation to the official detention facility at which the sentence is to be served. 18 U.S.C. § 3585(a)."); *Wong v. Warden*, No. 4:24-CV-04117-CBK, 2024 WL 4027918, at *2 (D.S.D. Sept. 3, 2024) ("[T]he BOP's final rule for the start date that an inmate may earn FSA Time Credits is contrary to Congress's directive that the BOP is required to 'provide all prisoners with the opportunity to actively participate in [EBRR] programs ... **throughout their entire term of incarceration.'** 18 U.S.C. § 2621(h)(6)."); *Yufenyuy v. Warden, FCI Berlin*, 659 F. Supp. 3d 213, 218 (D.N.H. 2023) ("Here, the date established by the plain language of the FSA upon which Mr. Yufenyuy was entitled to begin earning FSA time credits is June 9, 2021. The regulation's definition of a different date is contrary to the express language of the FSA. . . . Therefore, this Court finds that 28 C.F.R. § 523.42(a) cannot be applied to prevent Mr. Yufenyuy from earning time credits to which he is entitled under the plain language of the FSA."); *Patel v. Barron*, No. C23-937-KKE, 2023 WL 6311281, at *5 (W.D. Wash. Sept. 28, 2023) (concluding that 28 C.F.R. § 523.42(a) "conflicts with an unambiguous statute" because it "adds an additional exclusion, namely, the time in between the commencement of a prisoner's sentence and when the prisoner ultimately arrives at his BOP-designated facility where his sentence will be served.").

The Court agrees with the interpretation of the FSA set forth in these cases. Under *Loper Bright*, the Court may not defer to the BOP's interpretation of the FSA and must engage in its own statutory interpretation to resolve this issue. *See* 603 U.S. at 413. In doing so, the Court notes that Congress explicitly required that the BOP provide

"prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, **throughout their entire term of incarceration.**"  18 U.S.C. § 3621(h)(6) (emphasis added).  The BOP's interpretation that a prisoner's "term of imprisonment" begins after "the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served," clearly contradicts the statutory definition, that "[a] sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." *Compare* 28 C.F.R. § 523.42(a), *with* 18 U.S.C.A. § 3585.

The Court concludes that 28 C.F.R. § 523.42(a) is invalid, and that prisoners are eligible to earn FTCs beginning the date they are received in custody awaiting transportation to, or arrive voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served.  The BOP cannot, as a blanket rule, consider prisoners ineligible until they arrive at the designated Bureau facility where the sentence will be served.[5]  However, whether the Court can retroactively award FTCs

---

[5]     The Court notes that in this case, Montoya spent part of his sentence in state prison, serving his concurrent state and federal sentences.  (Dkt. 14 ¶¶ 9-11.)  The parties dispute whether the state of Illinois relinquished primary custody of Montoya, and whether Montoya should have been in federal rather than state prison during that time. (*Compare* Dkt. 27 at 50-52, *with* Dkt. 12 at 6-8.)  It is the BOP's policy that "Federal inmates in state custody are not eligible to earn FTCs."  (Dkt. 13-6 at 10.)  However, Respondent makes no argument that the FSA categorically excludes such inmates. Because the Court concludes in Section III.B that it cannot award FTCs for activities that took place before a prisoner's statutory risk and needs assessment, the Court does not

for activities Montoya engaged in before he arrived at USP Atwater requires further analysis.

**B.    Whether Montoya Successfully Participated in EBRRPs or PAs Prior to His Arrival at USP Atwater**

The Court next considers whether the activities that Montoya completed prior to arriving at USP Atwater can be considered in calculating his FTCs.  Under BOP regulations, "Successful participation" requires "a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs **that the Bureau has recommended based on the inmate's individualized risk and needs assessment**, and has complied with the requirements of each particular EBRR Program or PA."  24 C.F.R. § 523.41(c)(2) (emphasis added).  Accordingly, Respondent argues that Montoya could not have successfully participated in EBRRPs or PAs prior to his individualized risk and needs assessment, which took place only upon his arrival at USP Atwater.  (Dkt. 12 at 17.)  Respondent reasons that "[a]warding FTCs to an inmate before he has even undergone an assessment designed to identify appropriate EBRR programing and productive activities would controvert the FSA's mandate that incentives be based on a structured, evidence-based system."  (*Id.*)

Montoya responds that "there is nothing in the statute requiring these assessments to be done before an inmate can accrue credits for participating in programming."  (Dkt. 27 at 19.)  Montoya cites cases around the country in which courts reached that

reach the question of to what extent the FSA applies to federal prisoners who are serving concurrent federal and state sentences in state prison.

conclusion and ordered the BOP to retroactively determine whether a petitioner's past activities were consistent with their individualized risk and needs assessment and recalculate time credits accordingly.  *See Pelullo*, 2024 WL 3771691, at *5 ("BOP must make an individualized determination concerning whether Petitioner participated in BOP programing based on his individualized risk and needs assessment, and whether he complied with the requirements of each particular EBRR Program or PA, during Blocks One, Three, Six, and Eight. BOP must then recalculate Petitioner's time credits accordingly, if appropriate."); *Modeste*, 809 F. Supp. 3d at 903 (requiring respondents to "determine whether Petitioner is entitled to additional FSA time credits for having 'successfully participated' in programming while housed at FCI Victorville that was consistent with Petitioner's individualized needs assessment conducted after his arrival at FCI Lompoc" and "recalculate Petitioner's FSA time credits to include any credits earned beginning August 6, 2024."); *Puana v. Williams*, No. 24-CV-01088-CNS, 2024 WL 4932514, at *2, 5 (D. Colo. Dec. 2, 2024) (noting that § 523.41(c)(2) merely requires "a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA. . . . The BOP can make these determinations before or after an inmate has completed an EBRR or PA" and ordering the BOP to "recalculate Mr. Puana's earned time credits under the FSA, giving him credit for any EBRR program or PA he has completed that complies with the requirements of each particular program or activity from September 12, 2022, when he began serving his sentence, to the present.").

17

However, courts in this District have consistently reached the opposite conclusion. In *Tejeda v. Bureau of Prisons*, the court concluded that FSA qualifying programing and activities "cannot happen prior to a PATTERN assessment, since that is the tool that informs the BOP *what* type of programming needs a prisoner has." No. 24-CV-4343 (JMB/DLM), 2025 WL 4357098, at *3 (D. Minn. Sept. 19, 2025), *R. & R. adopted*, 2026 WL 526661 (D. Minn. Feb. 25, 2026); R. & R. at 6-7, *Smith v. Bureau of Prisons*, No. 24-cv-4268 (D. Minn. Apr. 14, 2025) (Dkt. No. 9) (concluding that there was no evidence in the record that the petitioner successfully participated in EBRRPs or PAs because "there is no indication in the record that the 'prison job' or 'behavior modification' training referenced by Petitioner was recommended or approved by the BOP as a qualifying evidence-based recidivism reduction program or other productive activity," among other reasons); *Luque v. Fed. Bureau of Prison*, No. 23-CV-3893 (NEB/DLM), 2024 WL 6043893, at *5 (D. Minn. Apr. 19, 2024) ("Under the FSA, prisoner EBRR programming and PA assignments are, by Congress's design, inextricably attached to FTC-earnings as part of the FSA's goals of risk reduction and rehabilitation. *See* 18 U.S.C. § 3632(d)(4)(A). In other words, if a prisoner has no EBRR programming or PA assignments, they would be unable to earn FTCs because they are not engaging in the rehabilitative work envisioned by the FSA.").

The Court begins its analysis with the text of the statute. The FSA requires that

The [Risk and Needs Assessment System] shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including—

18

> (1)   programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific **criminogenic needs**; and
>
> (2)   information on the best ways that the Bureau of Prisons can tailor the programs to the specific **criminogenic needs** of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

18 U.S.C. § 3632(b) (emphasis added).  Montoya is correct that the FSA does not explicitly state that no EBBRPs or PAs can take place prior to a risk and needs assessment.  However, the FSA requires the BOP to assign these activities "according to the prisoner's specific criminogenic needs." *Id.*  The FSA also requires participating prisoners to undergo periodic reassessment as follows:

> A prisoner who successfully participates in evidence-based recidivism reduction programming or productive activities shall receive periodic risk reassessments not less often than annually, and a prisoner determined to be at a medium or high risk of recidivating and who has less than 5 years until his or her projected release date shall receive more frequent risk reassessments. If the reassessment shows that the prisoner's risk of recidivating or specific needs have changed, the Bureau of Prisons shall update the determination of the prisoner's risk of recidivating or information regarding the prisoner's specific needs and reassign the prisoner to appropriate evidence-based recidivism reduction programming or productive activities based on such changes.

18 U.S.C. § 3632(d)(5).  The provision requires that the BOP reassess what programs are appropriate for a prisoner's needs as those needs change over time.  Given this statutory scheme, the Court agrees with the other courts in this District that FSA time credits can only be earned by engaging in EBRRPs and PAs that the BOP has assigned to a prisoner based on their specific needs as assessed during the relevant time period.  The Court concludes that it would contravene the requirements of the FSA to award FTCs for activities that were not assigned pursuant to the FSA's risk and needs assessment system.

19

The Court is also not persuaded by Montoya's argument that "the BOP doesn't even always follow the rule it touts in this case" because it at times has afforded a presumption of participation to prisoners who had not actually participated in FSA programming. (*See* Dkt. 27 at 19-20.) However, as the Fourth Circuit has explained, "the BOP's decision to award credits absent actual participation does not expand its statutory obligations under the FSA. The law remains clear that a prisoner's statutory right to FSA time credits is tied to his actual participation in qualified programming." *White v. Warden of Fed. Corr. Inst. - Cumberland*, 164 F.4th 326, 332 (4th Cir. 2026). Courts in this District have rejected the premise that FTCs may be awarded when they have not been earned. *E.g.*, *Martinez v. Eischen*, No. 24-CV-637 (KMM/DJF), 2024 WL 1598772, at *2 (D. Minn. Apr. 12, 2024) ("Such relief is plainly barred by the statute because the First Step Act is explicitly clear that FTCs are only granted when a prisoner 'successfully completes' approved programming or activities." (footnote omitted) (quoting 18 U.S.C. § 3632(d)(4)(A))).

The conclusion that the Court cannot awarded FTCs for activities conducted prior to Montoya's risk and needs assessment is not inconsistent with the Court's conclusion in Section III.A that prisoners are eligible to earn FTCs beginning on the date their sentence commences pursuant to 18 U.S.C. § 3585(a), and that under 18 U.S.C. § 3621(h)(6), the BOP is required to "provide all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, throughout their entire term of incarceration." Reading these statutory provisions together, the BOP is required to conduct an assessment of a

prisoner's risks and needs promptly after their sentence commences.  If the BOP fails to do so, a prisoner may seek a court order compelling the BOP to conduct the appropriate assessment to allow them to begin participating in FSA programing.  *See White*, 164 F.4th at 332 ("If White believed that the BOP had wrongfully denied him programming on any given day during his incarceration, he could have requested, as the remedy, an administrative correction of the omission or even a court order directing the BOP to provide the claimed programming."); *Huihui*, 2023 WL 4086073, at *7 (ordering the BOP to conduct the required assessment so that Petitioner could begin earning FTCs).

C.     **Whether Montoya Should Have Earned FTCs During the Time he Spent in Transfer Between Facilities**

Having concluded that Montoya did not earn FTCs prior to undergoing a risk and needs assessment at USP Atwater, the only remaining question is whether Montoya earned FTCs while he was in transit from USP Atwater to FPC Duluth between March 26, 2024 and May 12, 2024.  (*See* Dkt. 13 ¶ 19.)  Montoya claims that he worked as an orderly during this time.  (Dkt. 1 at 3.)  Respondent states that this assertion is not supported by the record, and notes that Montoya "was in transit between numerous institutions" during that period.  (Dkt. 12 at 18 n.5.)  Respondent also suggests that Montoya's assertion that he worked as an orderly "is questionably identical to other habeas petitions filed by inmates at FPC Duluth."  (*Id.*)  Whether or not Montoya did work as an orderly, Montoya does not assert, and the record does not support, that such work was FSA programing that the BOP assigned to Montoya based on his individualized risk and needs assessment.  Accordingly, the Court concludes that

Montoya did not earn FTCs during his time in transit between USP Atwater and FPC Duluth.

* * *

Based on the current record, the Court concludes that Montoya has not been denied any FTCs to which he was entitled.  It is not clear from the parties' submissions whether, apart from the potential FTCs that were at issue in this Report and Recommendation, Montoya has earned additional uncontested FTCs such that briefing is necessary on the question of whether those FTCs may be applied to shorten the duration of his term of supervised release.  (*See* Dkt. 35.)  Accordingly, the Court recommends that the parties be ordered to file a declaration with the Court as to whether Montoya has earned any uncontested FTCs which he believes should be applied to shorten his term of supervised relief or if Montoya seeks any other relief through this Petition.  If Montoya seeks additional relief, the parties should then file a proposed briefing schedule as to the remaining request for relief.

## IV.   RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Within 15 days of the date of this Report and Recommendation, Respondent be required to file with the Court a declaration setting forth an updated calculation of the FTCs that Montoya has earned to date.

2. Within 7 days of Respondent's filing, the parties be required to inform the Court of their position as to whether further briefing on the application of credits is necessary.

3. If further briefing is necessary, that a briefing schedule be set.

4. If further briefing is unnecessary, that Petitioner Fernando Montoya's Petition for a Writ of Habeas Corpus be **DENIED**.

Dated: March 31, 2026

s/Elizabeth Cowan Wright
ELIZABETH COWAN WRIGHT
United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).